Provectus Biopharmaceuticals, Inc. v. RSM US LLP, 2018 NCBC 100.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 10396

PROVECTUS
BIOPHARMACEUTICALS, INC.,

Plaintiff,

v.

RSM US LLP f/k/a McGLADREY,
LLP,

Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

1. **THIS MATTER** is before the Court upon Defendant RSM US LLP f/k/a McGladrey, LLP's ("RSM") Motion to Dismiss Plaintiff Provectus Biopharmaceuticals, Inc.'s ("Provectus") Amended Complaint under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Motion").

2. Having considered the Motion, the briefs and supplemental briefs in support of and in opposition to the Motion, and the arguments of counsel at the hearing on the Motion, the Court hereby **GRANTS in part** and **DENIES in part** the Motion.

> *Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, by Mark D. Griffin, Lori H. Patterson, Matthew G. White, and R. Andrew Hutchinson, and Erwin, Bishop, Capitano & Moss, P.A., by A. Todd Capitano, for Plaintiff Provectus Biopharmaceuticals, Inc.*

> *Williams & Connolly LLP, by Thomas H. Selby, Jessica Richard, and Amy B. McKinlay, and Poyner Spruill LLP, by Karen H. Chapman, Cynthia L. Van Horne, and Lee A. Spinks, for Defendant RSM US LLP f/k/a McGladrey LLP.*

Bledsoe, Chief Judge.

## I.

## FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). Rather, the Court recites the relevant allegations in the pleading asserting the challenged claims—here, Provectus's Amended Complaint.

4. Provectus is a publicly traded, development-stage biotechnology company with its principal place of business in Knoxville, Tennessee. (Am. Compl. ¶¶ 1, 14, ECF No. 24.) Provectus was founded in 2002 and focuses on developing drugs for certain cancers and skin conditions. (Am. Compl. ¶ 19.) At all relevant times, Provectus had four employees. (Am. Compl. ¶ 20.)

5. Defendant RSM is an Iowa limited liability partnership with its principal place of business in Illinois. (Am. Compl. ¶ 15.) RSM is the United States-based firm within RSM International, a global network of independent audit, tax, and consulting firms. (Am. Compl. ¶ 15.) RSM holds itself out as a leading provider of auditing, tax, wealth management, and consulting services. (Am. Compl. ¶ 15.) RSM is registered to conduct business in North Carolina and conducted its primary services at issue here through its North Carolina offices and personnel. (Am. Compl. ¶ 15.)

6. The present dispute between these two companies involves Provectus's contention that two of its executives received millions of dollars in wrongful

reimbursement payments as the result of intentional, willful, or negligent actions RSM took in the course of providing accounting or auditing services to Provectus.

7.      In 2007, RSM approached Provectus, marketing itself as a "one-stop resource for all of Provectus's accounting and financial needs."  (Am. Compl. ¶ 21.) Provectus decided to hire RSM because, with only four employees, Provectus lacked the internal resources or ability to manage and monitor its own financial and accounting systems.  (Am. Compl. ¶¶ 20, 22.)

8.      Beginning in 2007 and continuing through early 2016, RSM maintained three separate engagements with Provectus.  (Am. Compl. ¶¶ 2–3.)  The different engagements can be summarized as follows:

> (1) An outsourcing engagement, under which RSM provided comprehensive accounting services, human resources services, related technology services, and business consulting services;
>
> (2) An engagement for review of [Provectus's] financial statements, under which RSM advised on Form 10-K and Form 10-Q reporting requirements, reviewed financial statements for compliance with SEC rules and regulations, advised on specific footnote disclosures, advised on various technical accounting matters, and assisted with responding to the SEC on any comment letters relating to technical accounting matters; and
>
> (3) An engagement to provide internal audit and Sarbanes-Oxley ("SOX") compliance services, under which RSM directed [Provectus's] compliance with SOX Section 404, including the utilization of integrated risk management services to plan and conduct a Committee of Sponsoring Organizations of the Treadway Commission ("COSO") evaluation, to design and assess the effectiveness of [Provectus's] internal controls, and to assess operating effectiveness of [Provectus's] internal controls.

(Am. Compl. ¶¶ 2, 22.)  As a result of these engagements, Provectus alleges that RSM had "direct access to and day-to-day control over every aspect of Provectus's financial

and accounting systems from 2007 until early 2016, including complete control over the management of [Provectus's] general ledger." (Am. Compl. ¶ 23.)

9. As a particular part of its duties connected to its SOX compliance services "RSM developed, drafted, reviewed, and commented on the development of Provectus's internal controls environment, including Provectus's Purchase to Pay Process [Narrative]." (Am. Compl. ¶ 29.) This Purchase to Pay Process Narrative dealt with "the processes and responsibilities for reviewing, processing, and approving [Provectus] expenditures." (Am. Compl. ¶ 30.) These expenditures included advances and reimbursements for travel and entertainment ("T&E") expenses incurred by Provectus employees. (Am. Compl. ¶¶ 30–35.)

10. Under the Purchase to Pay Process Narrative, Provectus employees could receive wire transfer advances to cover future travel costs purportedly associated with Provectus. (Am. Compl. ¶ 49.) The process for advancing and documenting these wire transfers required the approval of key Provectus personnel:

> The CFO determines the need for a wire and completes the Wire Backup Form. This form is then signed by 2 of the 3 [Provectus] founders and the form is faxed to the bank for completion. The Wire Backup Form is attached to the Bank Confirmation and the CFO prepares the journal entry to record the transaction and forwards to [RSM] for posting. In addition, a copy of the transaction is given to the [Bible Harris Smith PC ("BHS")] staff member to make sure it is included properly on the reconciliation and processed in QuickBooks.[1]

---

[1] BHS was a CPA firm "retained by Provectus to provide data processing assistance within the accounting department and to prepare Provectus's Federal Income Tax Returns." (Am. Compl. 10 n.2.)

(Am. Compl. ¶ 35.) As part of this process, RSM received the advance requests and the necessary officer approval for the wire transfers. (Am. Compl. ¶ 49.)

11. The Purchase to Pay Process Narrative also allowed Provectus employees to be reimbursed for legitimate business expenses. (Am. Compl. ¶ 49.) This process worked as follows:

> Each employee prepares an itemized listing of expenses, attaches the support for each item and signs. This Expense Report is then forwarded through the CFO to the BHS Staff member who reviews the document for accuracy and completeness of backup and amounts. If there are problems these are discussed and resolved with the applicable employee and once final, they are signed off by the BHS staff and process[ed] as any other invoice.

(Am. Compl. ¶ 31.) As part of the reimbursement process, RSM received an expense reimbursement request and any paperwork submitted therewith. (Am. Compl. ¶ 49.)

12. The degree to which the T&E advances and reimbursement processes were followed allegedly changed over time. Prior to 2011, RSM requested, sampled, and tested T&E expense reports and received back-up documentation to support T&E expense payments. (Am. Compl. ¶ 60.) Beginning in 2011, however, RSM stopped receiving back-up documentation to show that the funds transferred to Provectus employees were actually used for company-related travel or other legitimate business purposes. (Am. Compl. ¶ 50.)

13. As another part of RSM's SOX engagement, RSM also issued quarterly and annual reports regarding RSM's control monitoring. (Am. Compl. ¶ 38.) To perform these services, RSM sampled Provectus's expense payments, including reimbursements for T&E expenses. (Am. Compl. ¶ 39.) For the majority of the parties' engagement, RSM represented that it had identified no material weaknesses

in Provectus's internal controls. (Am. Compl. ¶¶ 55, 63–75.) In February 2016, however, RSM issued a report acknowledging that certain aspects of Provectus's internal controls were materially deficient. (Am. Compl. ¶¶ 38, 54, 66–76.) Provectus now alleges that such weaknesses existed well before that time and that these weaknesses greatly harmed Provectus.

14. Between 2011 and 2016, Provectus's CEO, Dr. Craig Dees ("Dees"), received approximately $3.2 million in advances for T&E expenses. (Am. Compl. ¶ 7.) Dees did not substantiate these advances. (Am. Compl. ¶ 11.) Provectus's COO and CFO, Peter Culpepper ("Culpepper"), also received between $300,000 and $1.4 million in T&E reimbursements without providing adequate documentation. (Am. Compl. ¶ 7.) Provectus alleges that Dees and Culpepper never actually incurred any T&E expenses associated with these payments and were instead siphoning money from Provectus for their own gain. (Am. Compl. ¶ 11.)

15. Provectus contends that RSM bears responsibility for Dees's and Culpepper's wrongful advances and reimbursements. Provectus alleges that RSM (i) failed to design and implement satisfactory internal controls to prevent the payment of advances and reimbursements for illegitimate purposes, (Am. Compl. ¶ 60), (ii) knew of the nature and frequency of these T&E advances and reimbursements but never requested further document support from Provectus to validate whether Provectus funds had been used for legitimate business purposes, (Am. Compl. ¶¶ 8, 46), and (iii) continually made negligent and/or intentional misrepresentations to Provectus concerning the adequacy of Provectus's internal controls, Provectus's

finances, and RSM's own sampling through RSM's quarterly and annual reports, (Am. Compl. ¶ 61). In total, Provectus avers that RSM's failures and misrepresentations permitted Dees and Culpepper to loot Provectus of almost $4 million. (Am. Compl. ¶ 136.)

16. Provectus further alleges that in addition to suffering harm as a result of RSM's failure to provide proper SOX consulting services, Provectus is now facing problems due to other services RSM provided. As part of these other services, RSM recorded advance payments from Provectus's research and development ("R&D") account to vendors who conducted clinical trial testing of Provectus's products as part of the approval process sanctioned by the Food and Drug Administration. (Am. Compl. ¶¶ 77–78, 81–82.) Provectus alleges that "RSM utterly failed in its accounting and testing to determine which payments to vendors were still advanced payments and which had actually been billed against Provectus's account in respect to each individual vendor." (Am. Compl. ¶ 83.) Provectus further avers that its newly retained accountants and auditors have discovered other material weaknesses in Provectus's controls over financial reporting. (Am. Compl. ¶ 86.) Provectus claims that RSM's failures with regard to the R&D account and Provectus's financial reporting "pose the threat of being considered material as related to Provectus's financial statement reporting requirements," and that Provectus's new internal and external auditors are now investigating all of Provectus's advance payments from prior years due to RSM's conduct. (Am. Compl. ¶ 88.)

## II.

## PROCEDURAL BACKGROUND

17. Provectus filed its Complaint in this action on June 9, 2017 and subsequently filed an Amended Complaint on September 18, 2017. The Amended Complaint asserts claims against RSM for negligence, gross negligence, professional malpractice, negligent misrepresentation, intentional misrepresentation, fraudulent concealment, breach of contract, and breach of fiduciary duty.

18. On October 23, 2017, RSM filed the Motion, seeking dismissal of all claims under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. RSM also filed a supporting brief to which it attached a series of writings (the "Engagement Letters") that are signed by Provectus and memorialize RSM's SOX compliance services engagement with Provectus. (Def.'s Br. Supp. Mot. Dismiss Ex. A, at 6, 16, 26, 36, 45, 54, 62 [hereinafter "Engagement Letters"], ECF No. 32.) These letters are referenced in Provectus's Amended Complaint, (*E.g.*, Am. Compl. ¶ 42 (Provectus entrusted RSM to perform its internal audit services . . . in accordance with the engagement letters)), and Provectus has relied upon their contents in its briefing. (Pl.'s Resp. Opp'n Mot. Dismiss 18, ECF No. 37.)

19. The Court held a hearing on the Motion on December 19, 2017. Thereafter, the Court permitted supplemental briefing on certain issues raised at the December 19 hearing. That briefing was completed on January 16, 2018. The Motion is now ripe for resolution.

## III.

## LEGAL STANDARD

20.     In ruling on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citing *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979)).

21.     The Court will not grant a motion to dismiss "unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).  Therefore, dismissal of a claim pursuant to Rule 12(b)(6) is only proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim;  [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

22.     The Court construes the allegations in the pleading "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017).  The Court is not, however, required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human*

*Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005); *see also McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013). The Court may also reject allegations "that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). This includes consideration of "the contract which [is] the subject of the action and [is] specifically referred to in the complaint." *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 126, 254 S.E.2d 217, 220 (1979).

IV.

LEGAL ANALYSIS

23. RSM's Motion challenges Provectus's claims on several grounds, arguing that (i) the claims are time-barred under the terms of the Engagement Letters, (ii) Provectus's own negligence bars Provectus's negligence-based claims, (iii) Provectus has not stated a claim for breach of fiduciary duty, (iv) the economic loss rule bars Provectus's tort claims, (v) Provectus cannot show that its reliance on alleged misrepresentations was reasonable, (vi) Provectus has not met the requirements of Rule 9(b) in pleading its fraud-based claims, and (vii) Provectus is barred from seeking consequential and punitive damages under the terms of the Engagement Letters.

24. The Court begins by examining the timeliness of Provectus's claims before addressing RSM's various arguments specifically against Provectus's tort claims and the availability of consequential and punitive damages.

A.    Limitations Period for Provectus's Claims

25.    Dismissal of a claim under Rule 12(b)(6) is appropriate "if it appears on the face of the complaint" that the statute of limitations bars the claim. *Shepard v. Ocwen Fed. Bank, FSB*, 361 N.C. 137, 139, 638 S.E.2d 197, 199 (2006).[2] "Once a defendant raises a statute of limitations defense, the burden of showing that the action was instituted within the prescribed period [rests] on the plaintiff.  A plaintiff sustains this burden by showing that the relevant statute of limitations has not expired." *Id.*

26.    Similarly, where a statute does not prohibit a shorter limitations period, North Carolina courts generally uphold contractual provisions limiting the time period for bringing an action on a contract. *See Horne-Wilson, Inc. v. Nat'l Sur. Co.*, 202 N.C. 73, 74–75, 161 S.E. 726, 726 (1932) (holding plaintiff could not pursue action on a bond outside the twelve-month limitations period provided for by the bond's terms); *Beard v. Sovereign Lodge of Woodmen of the World*, 184 N.C. 154, 157, 113 S.E. 661, 662 (1922) ("[T]he time limited is not a statute of limitation, but a contract which imposes a restriction upon the right of action by definitely fixing the period within which the plaintiff must assert his rights, and . . . a failure to comply with such requirement works not only a denial of the plaintiff's remedy, but a forfeiture of

---

[2]    After an opportunity to fully brief the issue, both sides agree that North Carolina law governs Provectus's claims.  Based on the allegations in the Amended Complaint, the Court agrees and concludes that North Carolina law applies to Provectus's claims for purposes of this Motion. *See Torres v. McClain*, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000); *KLATMW, Inc. v. Elec. Sys. Prot., Inc.*, 2011 NCBC LEXIS 12, at *46 (N.C. Super. Ct. May 2, 2011); *cf. Schwarz v. St. Jude Med., Inc.*, 802 S.E.2d 782, 788 (N.C. Ct. App. 2017) (holding broadly worded forum-selection clause applied to contract and noncontract claims).  The Court reserves the right to alter this conclusion in later motion practice and at trial should the developing record require the Court to revisit the issue.

his right to enforce the defendant's obligation."); *Heilig v. Aetna Life Ins. Co.*, 152 N.C. 358, 359–60, 67 S.E. 927, 928 (1910) (noting North Carolina courts enforce terms within insurance policies that limit "the time in which actions to recover the loss covered by the policies can be begun").

27. There is some support for allowing parties to contractually limit their time to bring other claims as well, but the Court's research has disclosed no published North Carolina decision squarely addressing the issue. *See Steele v. Safeco Ins. Co. of Am.*, No. COA12-266, 2012 N.C. App. LEXIS 1274, at *7–8 (N.C. Ct. App. Nov. 20, 2012) (concluding that a one-year contractual limitation for the commencement of an action was reasonable and enforceable as to an unfair or deceptive trade practices claim); *see also Badgett v. Fed. Express Corp.*, 378 F. Supp. 2d 613, 622–23 (M.D.N.C. 2005) (holding a contractual limitation for the time to bring an emotional distress claim valid under federal and North Carolina law).

28. RSM argues that all of Provectus's claims are time-barred because the Engagement Letters contained limitations clauses that provided "[a]ny action against either party by the other in connection with this Agreement must be brought within eighteen (18) months after the cause of action arises." (Def.'s Br. Supp. Mot. Dismiss 7, ECF No. 31; *see* Engagement Letters 10, 19, 29, 39, 48, 56.) RSM also argues that the accrual scheme of N.C. Gen. Stat. 1-15(c) applies to all of Provectus's claims and that the last act giving rise to Provectus's claims occurred in October 2015. Combining the proffered eighteen-month limitations period and the October 2015 accrual date, RSM asserts that Provectus's Complaint, filed June 9, 2017, was

untimely because "[a]ll of Provectus's claims stem from the SOX compliance services that RSM provided pursuant to the annually-executed [E]ngagement [L]etters." (Def.'s Br. Supp. Mot. Dismiss 8.)

29. Provectus counters by alleging that the last act giving rise to Provectus's claims occurred in February 2016. Provectus also argues that the Engagement Letters' limitations clauses do not apply to its tort-based claims and that RSM is equitably estopped from asserting a limitations defense.

30. Before proceeding, the Court notes that RSM's characterization of the scope of the Engagement Letters appears problematic. The Engagement Letters before the Court address only RSM's "Quarterly Control Monitoring and [SOX] consulting engagements" with Provectus. (*E.g.*, Engagement Letters 1.) While a large part of Provectus's allegations do appear to stem from RSM's contractual agreement to provide these services, Provectus has also alleged that the parties entered into separate engagements for, among other things, (1) "comprehensive accounting services" and (2) the "review of [Provectus's] financial statements." (Am. Compl. ¶ 2.) For purposes of RSM's limitations period argument, however, this distinction is not material because even if the Engagement Letters' eighteen-month limitations period was intended to apply to all of RSM's engagements, the allegations in the Amended Complaint allow all of Provectus's examined claims to survive.

31. The parties' arguments present the Court with four questions to address: first, what statute of limitations would ordinarily govern each of Provectus's claims; second, whether the shortened limitations period in the Engagement Letters is

enforceable as to each of Provectus's claims; third, whether each claim is timely under the applicable accrual scheme and limitations period; and fourth, to the extent the Court concludes Provectus's claims are time-barred, whether the doctrine of equitable estoppel prevents RSM from asserting a limitations defense. The Court examines these questions with respect to each of Provectus's claims, with the exception of breach of fiduciary duty, which the Court deals with subsequently.

### 1. Professional Malpractice, Breach of Contract, and Negligence

32. For several of Provectus's claims, there is little question as to what statute of limitations applies. Claims for professional malpractice are generally subject to a three-year statute of limitations under N.C. Gen. Stat. § 1-15(c). *Babb v. Hoskins*, 223 N.C. App. 103, 107, 733 S.E.2d 881, 884 (2012). Section 1-15(c) also governs "claims arising out of the performance of or failure to perform professional services based on negligence or breach of contract." *Sharp v. Teague*, 113 N.C. App. 589, 592, 439 S.E.2d 792, 794 (1994) (internal quotation marks omitted); *see also Bader v. Kurdys*, No. 1:16-CV-00294, 2017 U.S. Dist. LEXIS 141893, at *3 (W.D.N.C. Sept. 1, 2017) (noting that under North Carolina law "claims for negligence or breach of contract that arise from allegations around the failure to perform professional services" are governed by N.C. Gen. Stat. § 1-15(c)). Thus, notwithstanding possible modification by the Engagement Letters, Provectus's claims for malpractice, breach of contract, and negligence are governed by section 1-15(c).

33. Next, in looking at the applicable limitations period in which Provectus was required to bring its claims for malpractice, breach of contract, and negligence, the

Court concludes it need not reach the issue of whether the Engagement Letters' eighteen-month limitation period is enforceable or whether the three-year period provided by section 1-15(c) applies because the claims are timely under either framework.

34. The limitations period to bring causes of action governed by section 1-15(c) "begins to run from defendant's last act giving rise to the claim or from substantial completion of some service rendered by defendant." *Harrold v. Dowd*, 149 N.C. App. 777, 781, 561 S.E.2d 914, 917 (2002). "To determine when the last act occurred, [courts] consider the contractual relationship between the parties and when the contracted-for services were completed." *Head v. Gould Killian CPA Grp., P.A.*, 812 S.E.2d 831, 838 (N.C. 2018). The key question here is thus when RSM carried out the last act giving rise to Provectus's malpractice, breach of contract, and negligence claims.

35. Provectus filed its Complaint on June 9, 2017, rendering claims that arose more than eighteen months prior to that date—i.e., before December 9, 2015—time-barred under the more restrictive limitations period provided by the Engagement Letters. RSM contends that the last act giving rise to Provectus's claims occurred either on October 27, 2015—the date RSM asserts it issued its final report to Provectus that allegedly contained negligently or intentionally misleading information about Provectus's expense-related internal controls—or in November 2015—when RSM contends it informed Provectus that it had questions about Provectus's advancements and reimbursements. RSM also argues that each

Engagement Letter constituted a separate agreement and that claims related to all but the most-recent Engagement Letter should be considered time-barred.

36. In contrast, Provectus contends that RSM's last act was in February 2016, when RSM first issued a report acknowledging any failures with Provectus's internal controls. Provectus relies upon its allegation that RSM continuously failed to "adequately develop and review Provectus's internal controls over financial reporting" up until this time to support its contention that February 2016 was the date of the last act giving rise to its claims. (Am. Compl. ¶¶ 76, 192.)

37. Addressing RSM's arguments, the documents RSM proffers to support its assertion that RSM's last act occurred in October or November 2015 are of limited potency on a Rule 12(b)(6) motion. Even if considered, this evidence does not definitively prove RSM's "last act" occurred before December 9, 2015 when the Amended Complaint's allegations are viewed in the light most favorable to Provectus. Further, on the facts pleaded, the Court cannot agree with RSM that each Engagement Letter represents a distinct agreement.

38. First, the parties debate whether the Court may consider the October 2015 report offered by RSM at the Rule 12(b)(6) stage. *See* N.C. R. Civ. P. 12(b); *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862. The Court need not decide that issue. Even if the Court were to consider the October 2015 report, the report in no way indicates that it was the last act giving rise to Provectus's claims. In fact, the report is identified as the "Q3 Control Monitoring Report," (Def.'s Br. Supp. Mot. Dismiss Ex. C, at 1, ECF No. 32), suggesting that RSM had yet to make the final allegedly

misleading Quarterly Control Monitoring Report for 2015. (*See* Am. Comp. ¶¶ 75–76.) In short, the October 2015 report's date does not "contradict" the allegations in the Amended Complaint, *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862, and does not disclose a fact that necessarily defeats Provectus's claim when considered against the four corners of the Amended Complaint, *Oates*, 314 N.C. at 278, 333 S.E.2d at 224.

39. Second, for support that its last act occurred no later than November 2015, RSM cites to a complaint filed by Provectus against BHS in Tennessee state court (the "BHS Complaint"). The BHS Complaint alleges that "[i]n November 2015, Provectus was advised by its internal auditor, [RSM], that RSM had questions regarding advanced funds for expenses, reimbursements for expenses, and receipts for expenses, that were incurred by [Provectus's] now-former CEO, [Dees]." (Def.'s Br. Supp. Mot. Dismiss Ex. B, at 5, ECF No. 32.) Even if the Court were to take judicial notice of this allegation, *Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, 2018 NCBC LEXIS 16, at \*14 (N.C. Super. Ct. Feb. 16, 2018) ("Courts may in their discretion take judicial notice of court filings made in other jurisdictions."), that RSM communicated to Provectus that it had questions about Dees's expenses in November 2015 does not, when viewed in the light most favorable to Provectus, conclusively determine that RSM's last act or substantial completion of services giving rise to Provectus's claims occurred at that time.

40. Finally, the Engagement Letters outlining RSM's engagement with Provectus do not, on their face, clearly create the compartmentalized series of

agreements RSM postulates. For one thing, while both parties describe the Engagement Letters as annual agreements, none of the Engagement Letters presented to the Court contain a stated duration or term providing for only one year's worth of services. To the contrary, the Engagement Letters appear to contemplate continuing services provided by RSM, such as "[o]ngoing internal controls monitoring." (Engagement Letters 60.) The letters also appear to have been signed at varying intervals—the first letter is dated January 9, 2007; the second August 19, 2009; the third June 28, 2011; the fourth March 12, 2012, (Engagement Letters 31, 41, 50, 57)—and all but the first letter provide that they are meant to "supersede all prior oral and written communications" between the parties "and may be amended, modified or changed . . . in writing when signed by both parties," (Engagement Letters 7, 17, 27, 37, 46, 55).

41. The Court does not believe that these provisions, or what the Court may discern about the circumstances surrounding each Engagement Letter under the limitations of Rule 12(b)(6), allow the Court to conclude as a matter of law that the Engagement Letters constitute separate agreements, each with their own limitations period, at this stage of the proceedings. *See Fulghum v. Selma*, 238 N.C. 100, 104, 76 S.E.2d 368, 370 (1953) ("Where the parties to a contract calling for a continuing performance fix no time for its duration and none can be implied from the nature of the contract or from the surrounding circumstances, the contract is terminable at will by either party on reasonable notice to the other."); *see also Electro Lift, Inc. v. Miller Equip. Co.*, 4 N.C. App. 203, 207, 166 S.E.2d 454, 456 (1969) ("Parties to

a contract may, by mutual consent, agree to change its terms."); *cf. Williamson v. PricewaterhouseCoopers LLP*, 872 N.E.2d 842, 847 (N.Y. 2007) (holding claims on some of plaintiff's annual engagements with an auditor were time-barred under New York's applicable statute of limitations where each agreement was for "separate and discrete audit services" for plaintiff's year-end financial statements and did not contemplate further work).

42. Instead, viewing Provectus's allegations as proven and looking at the contractual relationship between the parties as pleaded, the duration of the parties' engagement, and when the alleged mistakes could no longer be remedied, as well as the negligence and contractual breach alleged, the Court finds that a factfinder could reasonably conclude that RSM's last act occurred in early 2016. The Amended Complaint alleges that the engagements between Provectus and RSM lasted at least until February 2016. Under the terms of that relationship, RSM was to assist Provectus, "as requested, in the development and implementation" of an "ongoing internal audit plan" and ongoing monitoring. (Engagement Letters 2–3.) RSM warranted that its services would be performed "with reasonable care in a diligent and competent manner." (Engagement Letters 7.) Provectus's claims for malpractice, negligence, and breach of contract are based, in part, on allegations that RSM continuously failed to properly implement or monitor Provectus's internal controls and that RSM's failure to meet its ongoing obligations allowed Dees and Culpepper

to receive improper fund transfers through at least the beginning of 2016. (Am. Compl. ¶ 7.)

43. Based on these allegations, the Court concludes that Provectus has sufficiently alleged facts showing that RSM's last act giving rise to Provectus's malpractice, negligence, and breach of contract claims occurred after December 9, 2015. *Compare Sunbow Indus., Inc. v. London*, 58 N.C. App. 751, 753, 294 S.E.2d 409, 410 (1982) (attorney's contracted-for services imposed a duty to represent plaintiff during closing and continuing duty to perfect plaintiff's security interest), *with Hargett v. Holland*, 337 N.C. 651, 655–56, 447 S.E.2d 784, 788 (1994) (holding the last act or completion of services by attorney occurred when attorney supervised the execution of a will and the contract with the attorney's client did not impose a continuing obligation to review or correct the will). *See generally Head*, 812 S.E.2d at 838 (discussing both *Sunbow* and *Hargett* for purposes of determining when a cause of action accrues under N.C. Gen. Stat. 1-15(c)). The claims are thus timely under the limitations periods provided by either the Engagement Letters or section 1-15(c).

44. Accordingly, the Court concludes that Provectus's claims for malpractice, negligence, and breach of contract will not be dismissed on limitation period grounds at the Rule 12(b)(6) stage. This decision does not preclude RSM from raising a statute of limitations defense as the factual record develops. In light of this conclusion, the

Court need not address Provectus's equitable estoppel argument with respect to these claims.[3]

### 2. Negligent Misrepresentation

45. Determining which statute of limitations applies to Provectus's claim for negligent misrepresentation and whether the eighteen-month limitation period in the Engagement Letters is enforceable against this claim is more difficult.

46. Our appellate courts have previously held that the three-year statute of limitations provided by N.C. Gen. Stat. § 1-52(5) applies to claims for negligent misrepresentation. *Guyton v. FM Lending Servs.*, 199 N.C. App. 30, 35, 681 S.E.2d 465, 470 (2009). These courts have also agreed that "[a] claim for negligent misrepresentation does not accrue until two events occur: first, the claimant suffers harm because of the misrepresentation, and second, the claimant discovers the misrepresentation." *Id.* at 35, 681 S.E.2d at 470–71 (internal quotation marks omitted). The Supreme Court of North Carolina has, however, alluded to the possibility that a claim for negligent misrepresentation may be brought into the fold of section 1-15(c) in certain circumstances. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 665, 488 S.E.2d 215, 223–24 (1997).

---

[3] RSM also contends that if the Court determines section 1-15(c) applies to any of Provectus's claims, the four-year statute of repose in section 1-15(c) bars all of Provectus's claims that accrued prior to June 2013. Section 1-15(c)'s statute of repose beings to run "from the last act of the defendant giving rise to the" malpractice action. N.C. Gen. Stat. § 1-15(c). Because the Court concludes that Provectus has pleaded facts that, when taken in the light most favorable to Provectus, allow for the conclusion that the last act giving rise to Provectus's claims governed by section 1-15(c) occurred after December 9, 2015, section 1-15(c)'s four-year statute of repose will not bar those claims at this stage of the case.

47.     In *Barger*, our Supreme Court noted that it had never expressly addressed "whether . . . a negligent misrepresentation claim would be tantamount to a professional malpractice claim for purposes of determining the appropriate statute of limitations." *Id.* at 665, 488 S.E.2d at 223. Faced with the question of what statute of limitations governed a claim for negligent misrepresentation by a non-client against an accounting firm, the court examined the language of section 1-15(c). *Id.* The court observed that section 1-15(c) applies to causes of action arising from a party's rendering of "professional services." *Id.*; *see also* N.C. Gen. Stat. § 1-15(c). Professional services, the court reasoned, "refers to those services where a professional relationship exists between plaintiff and defendant—such as a physician-patient or attorney-client relationship." *Barger*, 346 N.C. at 665, 488 S.E.2d at 223 (internal quotation marks omitted). Because no such professional relationship existed between the parties in *Barger*, the court concluded that section 1-15(c) did not govern the claim for negligent misrepresentation. *Id.* at 665, 488 S.E.2d at 223– 24 ("In the absence of a professional relationship between the parties, this claim cannot fall under the professional malpractice statute of limitations.").

48.     If the preeminent factor preventing section 1-15(c) from applying to a claim for negligent misrepresentation in *Barger* was the lack of a professional relationship, then here, where such a relationship is alleged to exist, *see Head v. Gould Killian CPA Grp., P.A.*, 795 S.E.2d 142, 149 (N.C. Ct. App. 2016) (holding evidence and allegations sufficient to support a client's claim for professional malpractice against accountants), *aff'd in part and rev'd in part on other grounds*, 812 S.E.2d 831 (N.C.

2018), it stands to reason that Provectus's negligent misrepresentation claim is "tantamount to a professional malpractice claim for purposes of determining the appropriate statute of limitations." *See Barger*, 346 N.C. at 665, 488 S.E.2d at 223. The facts alleged here show that an accountant-client or auditor-client relationship existed between Provectus and RSM, and Provectus's claim arises from alleged negligence in RSM's provision of professional services. Accordingly, the Court concludes that section 1-15(c) applies to Provectus's claim for negligent misrepresentation.

49. Having so concluded, the Court next concludes it need not reach the issue of whether the limitations period of the Engagement Letters or section 1-15(c) applies to Provectus's negligent misrepresentation claim because the claim is timely under either framework.

50. Under North Carolina law, omissions do not serve as a basis for a negligent misrepresentation claim. *Carmayer, LLC v. Koury Aviation, Inc.*, 2017 NCBC LEXIS 82, at *38 (N.C. Super. Ct. Sept. 11, 2017); *DeGorter v. Capitol Wealth, Inc.*, 2016 NCBC LEXIS 44, at *26 n.2 (N.C. Super. Ct. May 31, 2016). Here, this rule means that the last act giving rise to Provectus's claim for negligent misrepresentation must have been an actual misrepresentation by RSM, not simply a failure to correct an earlier misrepresentation. *See Carmayer, LLC*, 2017 NCBC LEXIS 82, at *38.

51. RSM argues that the last act giving rise to Provectus's claim for negligent misrepresentation occurred in October 2015, when RSM tendered the already discussed October 2015 report. As stated above, however, the October 2015 report

does not definitively establish that it was the last source of the alleged misrepresentations. Provectus avers that the 2015 Quarterly Control Monitoring Reports contained false or misleading information and that it was not until the 2015 annual report in February 2016 that RSM revealed the problems with Provectus's internal controls. (*See* Am. Comp. ¶¶ 75–76.) Therefore, viewing the alleged facts in the light most favorable to Provectus, the Court must acknowledge that RSM likely made its last allegedly misleading statement to Provectus on some date after the October 2015 Q3 report was issued and possibly after December 9, 2015. As stated previously, the October 2015 report does not "contradict" the allegations in the Amended Complaint, *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862, nor does it disclose a fact that necessarily defeats Provectus's claim when the Court considers the report against the four corners of the Amended Complaint, *Oates*, 314 N.C. at 278, 333 S.E.2d at 224. Consequently, Provectus's claim for negligent misrepresentation will not be dismissed on limitations period grounds at the motion to dismiss stage of this case. This decision does not prevent RSM from raising a statute of limitations defense as the factual record develops.

### 3. Intentional Misrepresentation and Fraudulent Concealment

52. Fraud by a professional is not within the scope of section 1-15(c). *Sharp*, 113 N.C. App. at 592, 439 S.E.2d at 794. Provectus's claims for intentional misrepresentation and fraudulent concealment thus fall under N.C. Gen. Stat. § 1-52(9). *See* N.C. Gen. Stat. § 1-52(9).

53. The Court need not decide whether the Engagement Letters' eighteen-month limitation period is enforceable as to Provectus's fraud-based claims because the claims are timely even if the shorter eighteen-month period applies.

54. Claims for fraud generally accrue at the time of discovery, "regardless of the length of time between the fraudulent act or mistake and plaintiff's discovery of it." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 297, 727 S.E.2d 1, 9 (2012). "[D]iscovery means either actual discovery or when the fraud should have been discovered in the exercise of reasonable diligence." *Id.* (internal quotation marks omitted).

55. RSM contends that Provectus discovered the basis for its intentional misrepresentation and fraudulent concealment claims in November 2015 by again citing the BHS Complaint. According to RSM, Provectus should have discovered its employees' fraud after learning "RSM had questions regarding advanced funds for expenses, reimbursements for expenses, and receipts for expenses, that were incurred by" Dees. (Def.'s Br. Supp. Mot. Dismiss Ex. B, at 5.) Because Provectus brought its fraud claims more than eighteen months after November 2015, RSM argues both fraud claims are untimely.

56. Here too, however, even if the Court were to take judicial notice of the allegations in the BHS Complaint, the cited language does not contradict or otherwise undermine Provectus's allegation in this litigation that Provectus did not discover RSM's misrepresentations until February 2016. That "RSM had questions regarding advanced funds" does not necessarily establish that, at that same time, Provectus

discovered—or through reasonable diligence should have discovered—the alleged facts that serve as the basis for Provectus's claims here. Accordingly, the Court concludes that RSM's Motion should be denied to the extent it seeks dismissal of Provectus's claims for intentional misrepresentation or fraudulent concealment on limitation period grounds on the facts pleaded. This decision does not prejudice RSM's ability to raise a statute of limitations defense as the factual record develops.

### 4. Gross Negligence

57. With respect to Provectus's claim for gross negligence, matters again become complicated. Unlike claims of breach of contract and ordinary negligence, the Court's research has revealed no case law in North Carolina addressing whether claims for gross negligence are subsumed within section 1-15(c)'s provisions when premised on facts that also give rise to a claim for professional malpractice. After carefully examining appellate precedent concerning gross negligence, ordinary negligence, and section 1-15(c), the Court concludes that section 1-15(c) does not apply to gross negligence claims.

58. "[T]he difference between ordinary negligence and gross negligence is substantial." *Yancey v. Lea*, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001). Our Supreme Court has previously defined gross negligence as "wanton conduct done with a conscious or reckless disregard for the rights and safety of others" or "wilful negligence [involving] a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another[.]" *Id.* at 52–53, 550 S.E.2d at 157–58. Whereas negligence connotes "inadvertence" of varying extremes, willfulness and

wantonness are characterized by intentional wrongdoing. *Id.* at 53, 550 S.E.2d at 158. Thus, "[a]n act or conduct rises to the level of gross negligence when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others." *Id.*

59. In the context of section 1-15(c), this difference has substantial implications. Our Court of Appeals has previously held that fraud by a professional "is not within the scope of 'professional services' as that term is used in N.C. Gen. Stat. § 1-15(c)," reasoning that fraud includes a "deliberate" breach of professional obligations. *See Sharp*, 113 N.C. App. at 592, 439 S.E.2d at 794. In that gross negligence involves acts "done purposely and with knowledge that such act is a breach of duty to others," *Yancey*, 354 N.C. at 53, 550 S.E.2d at 158, the same conclusion must be drawn—that willful and wanton conduct associated with a claim for gross negligence does not fall within "professional services," as that term is used in section 1-15(c), and "thus cannot be 'malpractice' within the meaning of that statute," *see Sharp*, 113 N.C. App. at 592, 439 S.E.2d at 794.

60. The Court therefore concludes that Provectus's gross negligence claim is not governed by section 1-15(c) and that the applicable statute of limitations would thus ordinarily be three years. *See* N.C. Gen. Stat. § 1-52(5). The Court next turns to whether the Engagement Letters' limitations period is enforceable as to this claim.

61. North Carolina case law supports the proposition that parties may contractually limit their risks associated with possible claims for ordinary negligence, *see Hall v. Sinclair Refining Co.*, 242 N.C. 707, 709, 89 S.E.2d 396, 397 (1955), but

does not provide the same basis for enforcing contractual protections against liability for intentional wrongdoing, *see Ada Liss Grp. v. Sara Lee Corp.*, No. 06CV610, 2010 U.S. Dist. LEXIS 59691, at *26–27 (M.D.N.C. Apr. 28, 2010) (noting that no North Carolina decision supports "enforcement of exculpatory clauses for intentional wrongdoing"). This contrast in North Carolina's law cautions against enforcing contract clauses that shorten the time period in which a party can seek relief for injuries resulting from intentional wrongdoing. The Court therefore concludes that the three-year statute of limitations provided by N.C. Gen. Stat. § 1-52(5) applies to Provectus's claim for gross negligence, not the eighteen-month period set forth in the Engagement Letters.

62. The final question for the Court to resolve is whether the three-year statute of limitations the Court has found applicable to a claim for gross negligence bars any part of Provectus's gross negligence claim here. Ordinarily, the statute of limitations for gross negligence begins to run from the date "the wrong [was] complete," *Lee v. City of Fayetteville*, No. 5:15-CV-638-FL, 2016 U.S. Dist. LEXIS 42366, at *19 (E.D.N.C. Mar. 30, 2016) (alteration in original) (quoting *Fulton v. Vickery*, 73 N.C. App. 382, 389–90, 326 S.E.2d 354, 359 (1985)), even if the damages or injuries at that time are nominal or undiscovered, *see Birtha*, 220 N.C. App. at 292, 727 S.E.2d at 9.

63. North Carolina recognizes "an exception to the general rule that a claim accrues when the right to maintain a suit arises" in the "continuing wrong doctrine." *Babb v. Graham*, 190 N.C. App. 463, 481, 660 S.E.2d 626, 637 (2008). "When this doctrine applies, a statute of limitations does not begin to run until the violative act

ceases." *Williams v. Blue Cross Blue Shield*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003). The doctrine is triggered by "continual unlawful acts," but "not by continual ill effects from an original violation." *Id.* To determine whether the doctrine applies, courts consider "the particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Id.* (quoting *Cooper v. United States*, 442 F.2d 908, 912 (7th Cir. 1971)). Here, Provectus argues that the continuing wrong doctrine operates to save its gross negligence claim.[4]

64. Provectus alleges three main categories of wrongful conduct giving rise to its gross negligence claim: (i) the preparation and communication of misinformation, (ii) a failure to properly test and monitor Provectus's internal controls or require substantiation for T&E expenditures, and (iii) a failure to adequately design or implement sufficient internal controls. (Am. Compl. ¶¶ 156–57.) For the first two categories of conduct, the Court concludes that Provectus has alleged continuing violations by RSM that fall within the three years prior to Provectus filing suit.

65. In contrast, with respect to the third category—inadequately designed internal controls—the last implementation of a T&E-related internal control alleged in the Amended Complaint occurred in 2010 when RSM assisted in developing the 2010 Purchase to Pay Process Narrative. (Am. Compl. ¶ 33.) Provectus acknowledges

---

[4] Provectus contends that the continuing wrong doctrine saves all of its claims in this case. The doctrine is not applicable, however, to Provectus's other claims, which are governed by section 1-15(c) or other incompatible accrual schemes. *See Williams*, 357 N.C. at 178–79, 581 S.E.2d at 423 (stating that the continuing wrong doctrine is an exception to the general accrual rule applicable to claims other than malpractice); *Birtha*, 220 N.C. App. at 297, 727 S.E.2d at 9. Thus, the only claim the doctrine affects is Provectus's gross negligence claim.

that this was the "only change" RSM made to the Purchase to Pay Process Narrative. (Pl.'s Resp. Opp'n Mot. Dismiss 15.) Thus, even if Provectus was subsequently injured as a result of gross negligence in the design of this process or a failure to correct flaws in the process, that harm would be a continuing ill effect from the original implementation of the 2010 Narrative, not a continuing wrong that would delay the accrual of Provectus's claim.

66.    As a result, the Court concludes Provectus's gross negligence claim is timely to the extent that claim is premised on wrongs concerning RSM's misrepresentations or failure to properly monitor Provectus's internal controls. To the extent the claim is based on RSM's grossly negligent design of Provectus's internal controls, however, the claim is time-barred unless the doctrine of equitable estoppel applies.

67.    "The doctrine of estoppel applies when a plaintiff shows the defendant's actions caused the plaintiff to be reasonably and justifiably misled into missing the statute of limitations deadline." *Turning Point Indus. v. Global Furniture, Inc.*, 183 N.C. Ap. 119, 125, 643 S.E.2d 664, 668 (2007). When considered in the context of a motion to dismiss under Rule 12(b)(6), the "issue is whether the complaint on its face sufficiently states a claim for relief to equitably estop" a defendant from asserting the statute of limitations. *Bryant v. Adams*, 116 N.C. App. 448, 460, 448 S.E.2d 832, 838 (1994). The essential elements of equitable estoppel are:

> (1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in

question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice.

*Id.*

68.     On its face, Provectus's Amended Complaint provides the essential elements for equitable estoppel to apply to Provectus's gross negligence claim to the extent that claim is based upon negligent design. Provectus alleges that RSM concealed the flawed design of Provectus's internal controls by giving false "satisfactory" ratings to Provectus in order to induce Provectus to continue its engagements with RSM. (Am. Compl. ¶¶ 55, 66–75, 203.) Provectus also alleges facts that, when taken as true, show its reliance on RSM's reports contributed to the damage done by Dees and Culpepper and prevented Provectus from filing suit within the three years following the implementation of the 2010 Purchase to Pay Process Narrative. (Am. Compl. ¶¶ 43, 59, 202.)

69.     RSM replies to Provectus's request for equitable estoppel relief by arguing that even if the above is true, Provectus has not alleged facts showing it lacked the means to discover the truth about its problematic advancement and reimbursement controls or the ways in which Dees and Culpepper were exploiting those controls. Provectus argues that this is not the case, contending that its allegations show that RSM's development, drafting, implementation, and testing of the internal controls prevented Provectus from knowing or having the means to know that the controls were deficient.

70.     The Court agrees with Provectus at this stage of the case. Provectus alleges facts showing that Provectus was unaware of the problems with its internal controls.

(*See, e.g.*, Am. Compl. ¶¶ 58–59.) Provectus also alleges that RSM was tasked with designing, monitoring, and testing the deficient advancement and reimbursement controls, that Provectus lacked the internal resources or ability to manage such controls, and that Provectus's CFO, the employee who played a central role in making sure Provectus followed the controls, was simultaneously exploiting weaknesses in those controls for his own profit. (Am. Compl. ¶¶ 20, 31–35, 39.) Viewing these facts in the light most favorable to Provectus, the Court concludes that the Amended Complaint sufficiently pleads that Provectus lacked a means of knowing the truth about the flawed internal controls to complete the necessary elements of equitable estoppel. As a result, the Court will not dismiss Provectus's claim for gross negligence based upon the design of Provectus's internal controls on statute of limitations grounds. This decision does not preclude RSM from raising a statute of limitations defense or challenging Provectus's assertion of equitable estoppel as the factual record develops.

B.     Tort Claims

71.     RSM offers several additional arguments to support dismissal of Provectus's tort claims. The Court addresses each in turn.

1.     Contributory Negligence

72.     RSM first contends that Provectus's negligence-based claims—negligence, gross negligence, professional malpractice, and negligent misrepresentation—should be dismissed because the Amended Complaint's allegations demonstrate contributory

negligence on the part of Provectus. Viewing the allegations in the light most favorable to Provectus, the Court disagrees.

73. "Contributory negligence is negligence on the part of the plaintiff which joins, simultaneously or successively, with the negligence of the defendant alleged in the complaint to produce the injury of which the plaintiff complains." *Piraino Bros. v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 351–52, 712 S.E.2d 328, 334 (2011) (internal quotation marks omitted). In North Carolina, a plaintiff's contributory negligence acts as "a complete bar" to its own negligence claims, *Swain v. Preston Falls E., L.L.C.*, 156 N.C. App. 357, 361, 576 S.E.2d 699, 702 (2003), and "gross contributory negligence" acts as a complete bar to recovery on a claim for gross negligence, *McCauley v. Thomas*, 242 N.C. App. 82, 89, 774 S.E.2d 421, 426 (2015). This doctrine can also serve to bar professional negligence claims, *see Piraino Bros.*, 211 N.C. App. at 351, 712 S.E.2d at 334, and claims for negligent misrepresentation, *see Swain*, 156 N.C. App. at 360–62, 576 S.E.2d at 702–03 (affirming trial court's dismissal of various negligence claims, including negligent misrepresentation, on contributory negligence grounds); *see also Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.*, No. COA08-700, 2009 N.C. App. LEXIS 830, at *34 (N.C. Ct. App. May 19, 2009) (noting that "justifiable reliance (an element of negligent misrepresentation) and contributory negligence (a defense to negligent misrepresentation) are closely associated bars to recovery" on negligent misrepresentation claims).

74. In the context of Rule 12(b)(6), the Court may dismiss negligence claims as a result of contributory negligence when a claimant's allegations, taken as true, "show

negligence on the [claimant's] part[,] proximately contributing to his injury, so clearly that no other conclusion can be reasonably drawn therefrom." *Mohr v. Matthews*, 237 N.C. App. 448, 451, 768 S.E.2d 10, 12–13 (2014) (quoting *Sharp v. CSX Transp., Inc.*, 160 N.C. App. 241, 244–45, 584 S.E.2d 888, 890 (2003)).

75. Here, RSM argues that Provectus's own negligence produced Provectus's alleged injury because Provectus played an essential part in the process for paying employee advances. That process required two of Provectus's three founders to approve T&E advances before the CFO, Culpepper, prepared the corresponding journal entry and forwarded information to RSM. (Am. Compl. ¶ 35.) In a company of four employees, this meant at least one Provectus employee not engaged in fraudulent acts approved each transaction. RSM thus contends that Provectus was negligent through its officers each time there was a fraudulent wire transfer. RSM further contends that Provectus contributed to its own injuries because Provectus was responsible for providing documentation to RSM to support requested reimbursements. (*See* Am. Compl. ¶¶ 48, 49.)

76. Provectus counters by arguing that true fault lies with RSM because RSM was the entity that negligently developed and implemented the processes for Provectus's T&E advances and reimbursements. Thus, Provectus contends, any problems arising from the process for approving these expenses are directly

attributable to RSM's negligence in creating a system that facilitated Dees's and Culpepper's alleged misconduct.

77. While RSM's arguments may potentially give rise to an inference of contributory negligence, the Court concludes that Provectus's allegations do not show contributory negligence "so clearly that no other conclusion can be reasonably drawn therefrom." *Mohr*, 237 N.C. App. at 451, 768 S.E.2d at 13. The Court cannot rule at this stage that Provectus's officers' approvals of problematic expenses and Provectus's failure to continue providing supporting documentation to RSM amount to negligence as a matter of law—particularly in light of Dees's and Culpepper's allegedly fraudulent conduct and the Amended Complaint's lack of specific facts concerning the reimbursement process and what Provectus's other two employees could have or should have known. *See Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 479, 562 S.E.2d 887, 896 (2002) ("The existence of contributory negligence is ordinarily a question for the jury[.]"); *Sharp*, 160 N.C. App. at 245, 584 S.E.2d at 891 (reversing trial court's dismissal of negligence claims on the basis of contributory negligence because, at the motion to dismiss stage, the complaint presented the question of whether plaintiff exercised due care).

78. Additionally, contrary to RSM's assertion that Provectus acted without due care as a matter of law through the fraudulent acts "of Dees and Culpepper themselves," (Def.'s Br. Supp. Mot. Dismiss 17), the Court cannot conclusively determine that such acts would render Provectus negligent under agency principles. *See Estes v. Comstock Homebuilding Cos.*, 195 N.C. App. 536, 542, 673 S.E.2d 399,

403 (2009) ("[A]n act of the servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed."); *Reinninger v. Prestige Fabricators, Inc.*, 136 N.C. App. 255, 262, 523 S.E.2d 720, 725 (1999) ("When, however, the agent has a reason or motive to withhold facts from his principal, the knowledge of the agent is not imputed to the principal." (internal quotation marks omitted)); *see also In re Am. Biomaterials Corp.*, 954 F.2d 919, 924–25 (3d Cir. 1992) (noting that an employee who embezzles from his corporation does not act within the scope of his employment in doing so). Accordingly, the Court will not dismiss Provectus's negligence-based claims on this basis under Rule 12(b)(6).

### 2. Breach of Fiduciary Duty

79.    RSM contends that Provectus's claim for breach of fiduciary duty should be dismissed because the allegations do not demonstrate that a fiduciary relationship existed between RSM and Provectus.

80.    For a successful breach of fiduciary duty claim, a plaintiff must show that "(1) [defendant] owed [plaintiff] a fiduciary duty; (2) [defendant] breached [its] fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to [plaintiff]." *Alkemal Singapore Private Ltd. v. DEW Glob. Fin., LLC*, 2018 NCBC LEXIS 36, at *34 (N.C. Super. Ct. Apr. 19, 2018) (citing *Farndale Co. v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006)). An initial requirement for a breach of fiduciary duty claim is a fiduciary relationship between the parties. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). North Carolina law recognizes that "a

fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*)[.]" *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 351 (N.C. Ct. App. 2016).

81. "[*D*]*e jure* fiduciary relationships . . . arise . . . because of the nature of the relationship, 'such as attorney and client, broker and principal, executor or administrator and heir, legatee or devisee, factor and principal, guardian and ward, partners, principal and agent, trustee and cestui que trust.'" *BDM Invs. v. Lenhil, Inc.*, 2012 NCBC LEXIS 7, at *51 (N.C. Super. Ct. Jan. 18, 2012) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). North Carolina courts, however, do not recognize *de jure* fiduciary relationships between accountants and their clients, or between external auditors and their clients. *See CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52–53, 790 S.E.2d 657, 660 (2016) (external auditors); *Harrold*, 149 N.C. App. at 783–84, 561 S.E.2d at 919 (accountants). Provectus acknowledges this point of law and thus only contends that a *de facto* fiduciary relationship existed between RSM and Provectus.

82. For purposes of determining whether a *de facto* fiduciary relationship exists, North Carolina courts compare the facts of a case to the well-settled definition of a fiduciary relationship:

> [A] fiduciary relationship [is] one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. All

fiduciary relationships are characterized by a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party.

*CommScope Credit Union*, 369 N.C. at 52, 790 S.E.2d at 660 (internal citations and quotation marks omitted). "Specifically, a fiduciary relationship arises whenever there is confidence reposed on one side, and resulting domination and influence on the other." *Head*, 812 S.E.2d at 837 (internal quotation marks omitted). This is a demanding standard, and "[o]nly when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." *BDM Invs.*, 2012 NCBC LEXIS 7, at *52 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998)). Accordingly, at this stage of the litigation, the Court examines whether the allegations in the Amended Complaint, if true, establish a *de facto* fiduciary relationship between RSM and Provectus.

83. The Engagement Letters state that RSM "[would] be entitled to rely on all of [Provectus's] decisions and approvals made independently, and [RSM would] not be obligated to evaluate, advise on, confirm or reject such decisions and approvals." (Engagement Letters 4.) It was Provectus's management that was ultimately responsible for all of the following:

> (1) establishing and maintaining effective internal control over financial reporting and safeguarding assets; (2) identifying and ensuring that [Provectus] complies with the requirements of the Sarbanes-Oxley Act and other laws and regulations applicable to [Provectus's] activities; [and] (3) informing [RSM] of all significant deficiencies and material weaknesses in internal controls of which [Provectus] has knowledge[.]

(Engagement Letters 4.) Such language does not suggest a relationship characterized by "domination and influence" or one in which RSM held "all the cards."

84. Nevertheless, Provectus also contends that a fiduciary relationship existed because RSM expanded its SOX compliance duties beyond those enumerated in the Engagement Letters to assume duties that were originally delegated to Provectus. For support, Provectus points to the 2007 Purchase to Pay Process Narrative, which RSM allegedly developed, reviewed, and commented on.

85. Provectus's allegations, however, also reveal that—pursuant to the 2007 Narrative—RSM recorded Provectus's expenditures only after two of the three Provectus founders approved the expenditure and after the CFO "prepare[d] the journal entry to record the transaction." (Am. Compl. ¶ 35.) Thus, even assuming RSM's development and review of the Purchase to Pay Process Narrative was extra-contractual, the developed system bestowed ultimate decision-making authority on Provectus. Such allegations do not establish a fiduciary relationship. *See Bradshaw v. Maiden*, 2015 NCBC LEXIS 80, at \*36 (N.C. Super. Ct. Aug. 10, 2015); *see also Kastel v. Nuveen Invs. Inc.*, No. 1:09CV646, 2015 U.S. Dist. LEXIS 113250, at \*18–20 (M.D.N.C. Aug. 25, 2015) (dismissing claim for breach of fiduciary duty under North Carolina law where defendant, a financial advisor, provided advice and direction to plaintiffs, but plaintiffs retained decision-making authority and failed to allege facts showing a lack of ability to make decisions).

86. Provectus attempts to assert a separate basis for a fiduciary relationship by reference to work RSM performed under engagements other than the SOX

compliance engagement, arguing that RSM also "provided comprehensive accounting, human resource technology, and business consulting services to Provectus in addition to internal audit functions." (Pl.'s Resp. Opp'n Mot. Dismiss 19.) Focusing on accounting, Provectus alleges that RSM had "direct access to and day-to-day control over every aspect of Provectus's financial and accounting systems from 2007 until early 2016, including complete control over the management of [Provectus's] general ledger." (Am. Compl. ¶ 23.)

87. This set of allegations shows that RSM had a very involved role in performing its accounting-related services for Provectus but still does not sufficiently allege that RSM's execution of its accounting-related services influenced, controlled, or dominated Provectus's decision-making process.

88. For instance, with regard to the potentially problematic R&D advances Provectus contends it is now examining, besides general and conclusory allegations of knowledge and control, Provectus alleges only that "RSM recorded [the R&D payments] in Provectus's financial statements and general ledger," that "RSM tested samplings of these payments as part of its comprehensive accounting and financial services," and that "RSM utterly failed in its accounting and testing to determine which payments to vendors were still advanced payments and which had actually been billed against Provectus's account[.]" (Am. Compl. ¶¶ 82–83.) Likewise, to the extent RSM played any role as an accountant in the T&E expenses process (as opposed to its role in drafting, implementing, and monitoring the controls overseeing those expenses), RSM's only tasks were (i) posting information about wire transfers

after Provectus's CFO had determined a wire transfer was necessary and two of Provectus's three founders had approved that transfer, (Am. Compl. ¶ 35), or (ii) receiving reimbursement requests and paperwork submitted therewith after Provectus's CFO and BHS had processed the reimbursement, (*see* Am. Compl. ¶¶ 31, 49).

89. These factual allegations describe accounting duties that were ministerial or administrative in nature and did not involve decision-making in which Provectus reposed confidence and trust in RSM. *Compare Head*, 812 S.E.2d at 837–38 (fiduciary relationship existed with accountant where the client executed a power of attorney for the accountant to handle all tax matters for the client, including engaging in communications with the IRS on the client's behalf), *with Venturtech II v. Deloitte Haskins & Sells*, 790 F. Supp. 576, 588 (E.D.N.C. 1992) (applying North Carolina law and concluding "that [defendant] did not owe a fiduciary duty to plaintiffs" where there was "no evidence before the court that [defendant], in preparing [third-party defendant's] financial statements, acted in a way to influence or control the plaintiffs in their investment decision"), *aff'd sub nom. Heritage Capital Corp. v. Deloitte, Haskins & Sells*, 993 F.2d 228 (4th Cir. 1993).

90. Thus, while Provectus may argue that RSM should have discovered the fraudulent T&E expenses and potentially problematic payments from Provectus's R&D account by virtue of RSM's provision of accounting-related services to Provectus and RSM's superior knowledge and expertise in relation to such matters, these allegations are insufficient to create a fiduciary relationship. *See Silverdeer, LLC v.*

*Berton*, 2013 NCBC LEXIS 21, at \*26–27 (N.C. Super. Ct. Apr. 24, 2013) ("[A]n accountant-client relationship is not an inherently fiduciary one and . . . mere allegations of the accountant's failure to properly advise his client [are] insufficient to support a claim for breach of fiduciary duty." (citing *Harrold*, 149 N.C. App. at 784, 561 S.E.2d at 919)).

91. Ultimately, Provectus alleges that RSM provided many services for Provectus as an accountant, auditor, and consultant and that Provectus relied on RSM's services because Provectus lacked the internal resources or ability to manage and monitor its accounting and financial systems. The Court concludes that these allegations fail to establish a relationship of trust and confidence in RSM sufficient to create a *de facto* fiduciary relationship under North Carolina law. *See, e.g.*, *BDM Invs.*, 2012 NCBC LEXIS 7, at \*52 (requiring that a *de facto* fiduciary "figuratively hold[] all the cards" in the parties' relationship). Accordingly, the Court concludes that Provectus has not sufficiently alleged the existence of a fiduciary relationship and that the Motion should be granted with respect to Provectus's breach of fiduciary duty claim.

### 3. The Economic Loss Rule

92. RSM next contends that North Carolina's economic loss rule requires the dismissal of each of Provectus's tort claims, arguing that the subject matter of these claims overlaps completely with the parties' contractual engagements. At the outset of this discussion, the Court notes that the economic loss rule does not apply to Provectus's fraud claims. *See Bradley Woodcraft, Inc. v. Bodden*, 795 S.E.2d 253, 259

(N.C. Ct. App. 2016) (holding that the economic loss rule does not apply to fraud claims). Therefore, the issue before the Court is whether the economic loss rule bars Provectus's claims for negligence, gross negligence, professional malpractice, and negligent misrepresentation.

93. North Carolina's economic loss rule is born out of the principle that "a breach of contract does not give rise to a tort action by the promisee against the promisor." *N.C. State Ports Auth. v. Lloyd A. Fry Roofing, Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978). The rule provides "limitations on the recovery in tort when a contract exists between the parties that defines the standard of conduct and which the courts believe should set the measure of recovery." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *47–48 (N.C. Super. Ct. Nov. 3, 2011). In short, this rule means that a tort action may not be brought against a "party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *7–8 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992)).

94. To maintain a tort claim for conduct "also alleged to be a breach of contract," the plaintiff must show "a duty owed by the defendant separate and distinct from any duty owed under a contract." *Id.* at *8 (quotation marks omitted). The tort claim "must be grounded on a violation of a duty imposed by operation of law, and the right

invaded must be one that the law provides without regard to the contractual relationship of the parties." *Rountree v. Chowan County*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017).

95. North Carolina courts do not appear to have expressly considered whether the economic loss rule bars tort claims brought against accounting or auditing professionals for work done pursuant to a contract. Other jurisdictions facing this issue have determined that the economic loss rule does not preclude such tort suits. *Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 18 (2d Cir 2000) ("While we recognize that some cases have applied the economic loss rule to bar recovery where the only loss claimed is economic in nature, and still others have applied that rule to professional malpractice cases, the better course is to recognize that the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions." (internal citations omitted)); *Moransais v. Heathman*, 744 So. 2d 973, 983–84 (Fla. 1999) ("[T]he economic loss rule does not bar a cause of action against a professional for his or her negligence even though the damages are purely economic in nature and the aggrieved party has entered into a contract with the professional's employer."), *overruled by Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 407 (Fla. 2013) (holding that the economic loss rule should be limited to product liability cases, rendering the *Moransais* exception moot); *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503, 515 (Ill. 1994) ("Accountants have long been held to be members of a skilled profession, and liable

for their negligent failure to observe reasonable professional competence. This duty to observe reasonable professional competence exists independently of any contract. The economic loss doctrine does not bar recovery in tort for the breach of a duty that exists independently of a contract."); *St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 351 (Iowa 2013) (noting that "purely economic losses are recoverable in actions asserting claims of professional negligence against attorneys and accountants" as an exception to the economic loss rule); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 89 (S.C. 1995) (noting that accountants and attorneys owe a duty to their clients "separate and distinct" from any contract for services).

96. North Carolina law appears to be in accord with these cases. It has been generally recognized in this State for some time "that an accountant may be held liable for damages naturally and proximately resulting from his failure to use that degree of knowledge, skill and judgment usually possessed by members of the profession in a particular locality." *Head*, 795 S.E.2d at 149; *Snipes v. Jackson*, 69 N.C. App. 64, 73, 316 S.E.2d 657, 662 (1984) (citing 1 Am. Jur. 2d *Accountants* § 15 (1962)). This potential liability is a function of tort law and exists independent of any contract. *See Head*, 795 S.E.2d at 149; *Shook v. Lynch & Howard, P.A.*, 150 N.C. App. 185, 187–88, 563 S.E.2d 196, 198 (2002); *Snipes*, 69 N.C. App. at 73, 316 S.E.2d at 662. Consequently, where a party seeks to recover in tort for an accountant's "failure to use that degree of knowledge, skill and judgment usually possessed by members of the profession in a particular locality," the Court concludes that the economic loss

rule will not bar such claims. *See Head*, 795 S.E.2d at 149; *Shook*, 150 N.C. App. at 187–88, 563 S.E.2d at 198; *Snipes*, 69 N.C. App. at 73, 316 S.E.2d at 662.

97. Provectus alleges that RSM provided accounting and auditing services to Provectus and asserts that RSM's negligent or grossly negligent provision of those services caused Provectus harm. (*See, e.g.*, Am. Compl. ¶¶ 59–60.) Based on these allegations, the Court concludes that RSM owed a duty to competently perform its services independent of the contractual engagements between the parties. *See Reich v. Price*, 110 N.C. App. 255, 259, 429 S.E.2d 372, 375 (1993) ("One who undertakes to render services in the practice of a profession owes a duty to exercise that degree of skill, care, and diligence exercised by members of that same profession." (quoting Restatement (Second) of Torts § 299A (Am. Law Inst. 1965))). Accordingly, the economic loss rule will not bar Provectus's tort claims in this case.

### 4. <u>Negligent Misrepresentation, Intentional Misrepresentation, and Fraudulent Concealment</u>

98. RSM's various arguments against Provectus's claims for intentional misrepresentation and fraudulent concealment can be collapsed into two main points: first, that Provectus's allegations do not demonstrate reasonable reliance, and second, that Provectus has not satisfied North Carolina Rule of Civil Procedure 9(b)'s pleading standards. If correct, these arguments also present a bar to Provectus's

claim for negligent misrepresentation, and the Court therefore addresses RSM's arguments as they apply to that claim as well.

a. Reasonable Reliance

99. RSM first argues that Provectus's fraud claims should be dismissed because Provectus's own allegations demonstrate that its reliance on any allegedly misleading representations was not reasonable.

100. "[A]ny reliance on . . . allegedly [fraudulent] representations must be reasonable." *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007). "[W]hen the party relying on [a] false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999). Likewise, a plaintiff's reliance on misrepresentations must be justifiable for a plaintiff to recover under a theory of negligent misrepresentation. *See Helms v. Holland*, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996). "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Forbis*, 361 N.C. at 527, 649 S.E.2d at 387.

101. For the reasons given in connection with RSM's contributory negligence defense, the Court concludes that the allegations in the Amended Complaint do not support only the conclusion that Provectus's reliance was unreasonable or that Provectus necessarily could have discovered the truth about its financial processing

systems and Dees's and Culpepper's conduct upon inquiry. As a result, the Court will not dismiss Provectus's claims for negligent misrepresentation, intentional misrepresentation, or fraudulent concealment on this ground at the Rule 12(b)(6) stage.

### b. Rule 9(b)'s Particularity Requirements

102. RSM also seeks dismissal of Provectus's intentional misrepresentation and fraudulent concealment claims by arguing that Provectus has failed to plead these claims with the particularity required by Rule 9(b).

103. Under Rule 9(b), to successfully plead a claim for fraud or negligent misrepresentation, a plaintiff must allege "the circumstances constituting [the claim] . . . with particularity." N.C. R. Civ. P. 9(b); *Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at *36 (N.C. Super. Ct. Apr. 20, 2018) ("[A]llegations of negligent misrepresentation must also be stated with particularity in compliance with Rule 9(b)."). This particularity requirement is met by alleging the "time, place and content of the . . . representation [in question], [the] identity of the person making the representation[,] and what was obtained as a result of the fraudulent acts or representations." *Birtha*, 220 N.C. App. at 296, 727 S.E.2d at 9 (quoting *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981)).

104. RSM first contends that Provectus's allegations fall short of Rule 9(b)'s requirements because Provectus has not pleaded what RSM "obtained" as a result of the alleged concealment and misrepresentations. The Court disagrees.

105. Provectus alleges that RSM's misleading statements and concealment of material deficiencies caused Provectus to extend or renew its engagements for RSM's services. (Am. Compl. ¶ 203.) Provectus also asserts that RSM safeguarded its own reputation by concealing the problems with Provectus's financial systems. (Am. Comp. ¶ 204.) RSM insists that these allegations do not plead with particularity what RSM obtained, arguing that similar allegations are insufficient to show a "benefit" was obtained in the context of a claim for constructive fraud. *See Barger*, 346 N.C. at 667, 488 S.E.2d at 224 (holding that a "continued relationship with plaintiffs" was not sufficient to constitute a "benefit required for a claim of constructive fraud"); *Deyton v. Estate of Waters*, 2013 NCBC LEXIS 19, at *30–31 (N.C. Super. Ct. Apr. 25, 2013) (plaintiff's contention that defendants committed fraud to protect their own reputation was not sufficient to show that defendants received a benefit to support a constructive fraud claim). RSM's argument, however, improperly confounds the requirements for two distinct causes of action.

106. A claim for constructive fraud is fundamentally different from a claim for actual fraud in that "it is based on a confidential relationship rather than a specific misrepresentation," *Barger*, 346 N.C. at 654, 488 S.E.2d at 217 (quoting *Terry*, 302 N.C. at 85, 273 S.E.2d at 678–79), and does not require proof of a defendant's intent to deceive, *Forbis*, 361 N.C. at 529, 649 S.E.2d at 388. The claim of constructive fraud originated in the courts of equity and is based on the notion "not that there *is* fraud, but that there *may* be fraud" where a fiduciary has consummated a transaction benefiting himself and harming those to whom he owes a fiduciary duty. *Lee v.*

*Pearce*, 68 N.C. 76, 81 (1873). In such circumstances, courts presume fraud due to the suspicious nature of the transaction—a superior party, who should place the interests of another before his own, has obtained a benefit while simultaneously injuring those who have placed their trust and confidence in him. *See Barger*, 346 N.C. at 666, 488 S.E.2d at 224; *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 116, 343 S.E.2d 879, 884 (1986); *Terry*, 302 N.C. at 83, 273 S.E.2d at 677; *Lee*, 68 N.C. at 81. The fact the defendant obtained a benefit is thus the defining feature of constructive fraud and what sets such a claim apart from a claim for breach of fiduciary duty. *See White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 155–56 (2004).

107. In contrast, the elements of a claim for actual fraud are "(1) [a] [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). This claim affords plaintiffs a remedy when they have been harmed by another's intentional deceit. *See id.* And while the deceiver inevitably obtains a benefit in most cases of fraud, the Court has not found, and the parties have not cited, any case holding that a claim for actual fraud requires an allegation that the defendant received a benefit sufficient to support a claim for constructive fraud (as opposed to a specific allegation concerning what was obtained or what the deceiver stood to obtain). Imposing such a requirement on fraud claims goes against common

sense and could hypothetically leave plaintiffs without a remedy in those cases where a deceiver acts purely out of malice or spite and without tangible benefit.

108. In short, because the legal theories underlying constructive fraud and actual fraud are distinct, the Court concludes that it would be improper to apply case law concerning those benefits that may, or may not, allow a presumption of fraud in the context of constructive fraud to determine whether Provectus has pleaded a claim for actual fraud with requisite particularity under Rule 9(b). The Court draws the same conclusion to the extent a similar argument can be asserted against Provectus's negligent misrepresentation claim. Certainly, where a plaintiff makes vague allegations, or makes no allegations, about what was obtained as the result of misrepresentations or concealment, dismissal is appropriate. *See S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 611, 659 S.E.2d 442, 450 (2008) (affirming dismissal of fraud claim where the plaintiff merely alleged that the defendants "obtained proprietary information" from plaintiff); *Harrold*, 149 N.C. App. at 782–83, 561 S.E.2d at 918–19 (affirming dismissal of fraud claim where plaintiffs completely failed to allege what was obtained as the result of fraud). But here, where Provectus has alleged that RSM's actions preserved the engagements between RSM and Provectus and safeguarded RSM's reputation, (Am. Compl. ¶¶ 203–04), the Court concludes that Provectus has particularly pleaded what RSM "obtained" to the extent necessary to satisfy Rule 9(b).

109. RSM next argues that Provectus has failed to meet the pleading standards of Rule 9(b) because the Amended Complaint does not identify the particular dates

on which RSM made the alleged misrepresentations. Provectus disagrees and argues that the Amended Complaint is sufficient under Rule 9(b)'s standards because it puts RSM on notice of who allegedly made the representations, which reports those representations were contained in, what the reports contained, and the timeframe in which the representations were made. After reviewing the parties' arguments and Provectus's Amended Complaint, the Court agrees with Provectus.

110. Provectus's allegations of fraud revolve around RSM's alleged decision not to disclose "material facts concerning RSM's overall financial accounting and reporting services," such as the "material deficiencies in the internal control[s] over [Provectus's] financial reporting." (*See, e.g.*, Am. Comp. ¶ 202.) Provectus pleads that RSM represented in quarterly and annual reports to Provectus between 2011 to 2015 that Provectus's internal controls were "Satisfactory, as defined in RSM's reports[.]" (Am. Comp. ¶ 179.) Provectus quotes this definition in the Amended Complaint, averring that "Satisfactory" meant "[n]o significant observations exist[ed]; controls [were] considered adequate to mitigate operational, strategic and/or financial risks; [and] findings [were] not significant to the overall unit." (Am. Compl. ¶ 55.)

111. Provectus also identifies the reports containing the allegedly misleading information, the RSM employee that provided Provectus with each report, and the month or year RSM issued each report. (Am. Compl. ¶¶ 65–75.) Provectus does not allege specific dates for any report, but the Amended Complaint does contain the month and year that each annual report was made, (Am. Compl. ¶¶ 66, 88, 70, 72, 74), and alleges that the misleading statements also appeared in RSM's "Quarterly

Control Monitoring Reports" throughout 2011, 2012, 2013, 2014, and 2015, (Am. Compl. ¶¶ 67, 69, 71, 73, 75).

112. The purpose of Rule 9(b) is to provide a defendant with sufficient notice of the fraud alleged "in order to meet the charges." *See Terry*, 302 N.C. at 85, 273 S.E.2d at 678. There is no precise language or formula required to meet Rule 9(b)'s standards, and our appellate courts have held that a pleading is sufficiently particular "if, upon a liberal construction of the whole pleading, the charge of fraud might be supported by proof of the alleged constitutive facts." *Carver v. Roberts*, 78 N.C. App. 511, 513, 337 S.E.2d 126, 128 (1985) (quoting *Brooks Equip. & Mfg. Co. v. Taylor*, 230 N.C. 680, 686, 55 S.E.2d 311, 315 (1949)). Provectus's allegations identify the reports in which Provectus contends the above discussed representations were made and consequently provide RSM with the information required to know which reports are the subject of Provectus's claims. Accordingly, in these circumstances, the Court concludes that Provectus's allegations are sufficient to meet the time, place, and content requirements of Rule 9(b) with respect to Provectus's fraud and negligent misrepresentation claims.

113. RSM also contends in its post-hearing brief that Provectus has not sufficiently pleaded fraudulent intent on the part of RSM, arguing that Provectus's allegations that RSM made misrepresentations knowingly and intentionally are conclusory and unsupported. The Court disagrees. Rule 9(b) allows a party to plead fraudulent intent generally. N.C. R. Civ. P. 9(b). As Provectus has otherwise particularly pleaded its fraud claims and has generally averred fraudulent intent,

(Am. Compl. ¶¶ 194–95), the Court will not dismiss those claims due to a general allegation of intent.

114. In sum, the Court will not dismiss Provectus's claims for negligent misrepresentation, intentional misrepresentation, or fraudulent concealment under Rule 9(b).

C.      Limitation of Liability Provisions

115. The final issue to be resolved on RSM's Motion is the extent to which Provectus may recover for its claims against RSM. RSM contends that the limitation of liability provisions in the Engagement Letters preclude Provectus from recovering consequential or punitive damages. In response, Provectus argues (i) that this issue is not ripe for the Court's determination at this stage of the litigation and (ii) that Provectus's tort claims arise independently from the Engagement Letters and thus are not subject to the limitation provisions. For the reasons discussed herein, the Court concludes that the limitation of liability provisions apply to some, but not all, of Provectus's claims.

116. "North Carolina follows a 'broad policy' which generally accords contracting parties 'freedom to bind themselves as they see fit[,]'" and "[e]nforcement of contractual liability limitations and damages exclusions is one aspect of this freedom of contract." *Severn Peanut Co. v. Indus. Fumigant Co.*, 807 F.3d 88, 91 (4th Cir. 2015) (quoting *Hall*, 242 N.C. at 709, 89 S.E.2d at 397–98). As a result, "a person may effectively bargain against liability for harm caused by his ordinary negligence in the performance of a legal duty arising out of a contractual relation." *Id.* (quoting

*Hall*, 242 N.C. at 709, 89 S.E.2d at 397). "[S]uch provisions will not be enforced," however, "where the result would be unconscionable and 'elicit a profound sense of injustice.'" *Performance Sales & Mktg., LLC v. Lowe's Cos.*, No. 5:07CV140, 2010 U.S. Dist. LEXIS 55426, at \*46 (W.D.N.C. June 4, 2010) (quoting *Blaylock Grading Co. v. Smith*, 189 N.C. App. 508, 512, 658 S.E.2d 680, 683 (2008)).

117.  Provectus first contends that this issue is not ripe for determination at this stage of the litigation, pointing to cases in which courts have deferred ruling on the effects of limitation of liability provisions pending further factual development of the record.  S*ee, e.g.*, *Lindsay v. Nichino Am., Inc.*, 202 F. Supp. 3d 524, 532–33 (M.D.N.C. 2016); *WakeMed v. Surgical Care Affiliates, LLC*, 243 N.C. App. 820, 827, 778 S.E.2d 308, 314 (2015); *Medfusion, Inc. v. Allscripts Healthcare Sols., Inc.*, 2015 NCBC LEXIS 34, at \*15 (N.C. Super. Ct. Mar. 31, 2015).  These courts, however, deferred ruling on the grounds that the contract provisions at issue were ambiguous, *see WakeMed*, 243 N.C. App. at 827, 778 S.E.2d at 314; *Medfusion, Inc.*, 2015 NCBC LEXIS 34, at \*15, or that more factual development was needed to determine whether the contract provisions were unconscionable, *see Lindsay*, 202 F. Supp. 3d at 532–33; *Performance Sales & Mktg., LLC*, 2010 U.S. Dist. LEXIS 55426, at \*46.

118.  Here, Provectus does not contend that the limitation of liability provisions are ambiguous or unconscionable and even alleges that all provisions of the Engagement Letters are enforceable.  The parties' sole disagreement goes to the scope of the limited liability provisions in relation to Provectus's claims.  The Court agrees with the parties that the Engagement Letters' limitation of liability provisions are

not ambiguous. It is therefore for the Court to determine the effect of these provisions as a matter of law. *Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co. of Raleigh*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998).

119. The limitation of liability provisions in the Engagement Letters provide that

> [T]he total liability of [Provectus] and [RSM] . . . relating to this Agreement will in no event exceed an amount equal to the fees paid (in the case of [RSM]'s liability) or owing (in the case of [Provectus's] liability) to [RSM] under this Agreement. In no event will [Provectus] or [RSM] . . . be liable for any special, consequential, incidental, punitive or exemplary damages or loss[.]"

(Engagement Letters 8; *see* Engagement Letters 18, 28, 38, 47, 56, 65 (containing substantially similar terms).)

120. As stated above, North Carolina law allows parties to contractually limit liability for acts of negligence flowing from their contractual relationship. *Hall*, 242 N.C. at 709, 89 S.E.2d at 397. The substantial majority of Provectus's allegations in this case take issue with RSM's provision of services under the parties' SOX compliance engagement. The main thrust of Provectus's claims is that RSM improperly developed and monitored controls for T&E expenditures and/or failed to notice, correct, or report—either negligently or intentionally—any problems with those controls. The Engagement Letters provided by RSM outlined RSM's provision of these SOX compliance services. (*See, e.g.*, Engagement Letters 1–5.) Even though Provectus now contends RSM undertook additional, SOX-related duties that went beyond the terms of the Engagement Letters, such as developing the Purchase to Pay Process Narrative, Provectus pleads that these tasks were carried out "[i]n connection with" the SOX compliance services. (Am. Compl. ¶ 30.) Thus the wrongdoing,

including tortious conduct, alleged here—i.e., failures to develop, implement, monitor, and provide information about the Purchase to Pay Process Narrative and other SOX compliance controls—"relate[s] to" the SOX compliance services RSM contracted to provide. *See, e.g., Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 18, 25, 331 S.E.2d 726, 728, 732 (1985) (provision in contract that specified "[a]ll claims . . . arising out of, or relating to, the Contract Documents or the breach thereof" was "sufficiently broad to include *any* claims which [arose] out of or [were] related to the contract or its breach, regardless of the characterization of the claims as tort or contract").

121. Accordingly, the Court concludes that the limitation of liability clauses in the Engagement Letters before the Court apply to Provectus's breach of contract, negligence, negligent misrepresentation, and professional malpractice claims to the extent those claims are related to RSM's "engagement to provide internal audit and [SOX] compliance services." (Am. Compl. ¶ 2.)

122. The Court will not, however, totally dismiss Provectus's requests for consequential and punitive damages.

123. First, the Court will not enforce the limitation of liability provisions in the Engagement Letters before the Court with respect to Provectus's gross negligence or fraud-based claims. As previously noted, "[t]he case law in North Carolina supports only the more limited proposition that exculpatory clauses [may] eliminat[e] liability for ordinary negligence" and offers no foundation for "the enforcement of exculpatory clauses for intentional wrongdoing." *Ada Liss Grp.*, 2010 U.S. Dist. LEXIS 59691, at

\*26–27; *cf. Oestreicher v. Am. Nat'l Stores, Inc.*, 290 N.C. 118, 136, 225 S.E.2d 797, 809 (1976) ("In the so-called breach of contract actions that smack of tort because of the fraud and deceit involved, we do not think it is enough just to permit defendant to pay that which the . . . contract required him to pay in the first place. If this were the law, defendant has all to gain and nothing to lose.").

124. Indeed, the majority of courts refuse to enforce contract terms exculpating intentionally harmful conduct. Joseph H. King, Jr., *Exculpatory Agreements for Volunteers in Youth Activities -- The Alternative to "Nerf (registered)" Tiddlywinks*, 53 Ohio St. L.J. 683, 728 (1992) ("[A] majority of courts . . . hold that exculpatory agreements are unenforceable if defendant's conduct constituted gross negligence."); *see also Waggoner v. Nags Head Water Sports*, No. 97-1394, 1998 U.S. App. LEXIS 6792, at \*23–24 (4th Cir. Apr. 6, 1998) (holding that plaintiff's negligence claim was barred by an exculpatory clause because there was no evidence to support the assertion that defendant acted intentionally or recklessly); Restatement (Second) of Contracts § 195 (Am. Law Inst. 1981) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.").

125. Accordingly, the Court finds that the limitation of liability provisions of the Engagement Letters will not prevent Provectus from recovering consequential or punitive damages should Provectus succeed on its claims for gross negligence, intentional misrepresentation, or fraudulent concealment. *See Andrews v. Fitzgerald*, 823 F. Supp. 356, 379 (M.D.N.C. 1993) (applying North Carolina law and

concluding "if Plaintiffs can prove that Defendants acted in a grossly negligent manner, Plaintiffs' claims for negligent misrepresentation will not be barred by the exculpation clause").

126. Second, though Provectus's claims, as pleaded, focus on the injury Provectus purportedly suffered as a result of RSM's alleged failure to adequately design, develop, and monitor Provectus's T&E expenditure controls pursuant to the SOX compliance engagement, (Am. Compl. ¶¶ 142–43, 150–51, 156–57, 163–64, 170–71, 178–79, 202, 213), the Court notes that Provectus has also pleaded (1) an outsourcing engagement between the parties for duties including accounting and (2) an "engagement for review of [Provectus's] financial statements," (Am. Compl. ¶ 2), as well as facts purportedly related to these other engagements.

127. In particular, Provectus has brought forward allegations that RSM failed to properly account for advances from Provectus's R&D account or recognize other weaknesses in Provectus's financial reporting. (Am. Compl. ¶¶ 77–88.) These allegations do not appear to relate to the SOX consulting engagement covered by the Engagement Letters before the Court. (*See, e.g.*, Engagement Letters 57.) It is not at all apparent that Provectus has suffered harm as a result of these additional alleged facts, (*see* Am. Compl. ¶ 88 (pleading that RSM's errors "pose the threat of being considered material"), and Provectus's standing to assert claims on these allegations is thus in doubt, *Neuse River Found. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002) ("Standing most often turns on whether the party has alleged 'injury in fact[.]'"). Nonetheless, the Court cannot say at this stage

that claims based upon these additional allegations are subject to the limitation of liability provisions in the Engagement Letters.

128. Consequently, to the extent Provectus's claims are premised on (1) its "outsourcing engagement, under which RSM provided comprehensive accounting services" or (2) the parties' "engagement for review of [Provectus's] financial statements," (Am. Compl. ¶ 2), the Court will not now rule that those claims are subject to a limitation of liability provision. The Court reserves the right to revisit this decision upon later motion practice.

V.

CONCLUSION

129. **WHEREFORE**, the Court hereby **ORDERS** as follows:

a. RSM's Motion is **GRANTED in part** as follows:

    i. Provectus's claim for breach of fiduciary duty is dismissed with prejudice.

    ii. Provectus shall not recover consequential or punitive damages on its claims for breach of contract, negligence, negligent misrepresentation, or professional malpractice to the extent those claims seek recovery for injuries related to RSM's engagement to provide internal audit and SOX compliance services.

b. RSM's Motion is **DENIED in part** as follows:

    i. Provectus's claims for negligence, breach of contract, professional malpractice, negligent misrepresentation, gross negligence,

intentional misrepresentation, and fraudulent concealment shall not be dismissed.

ii. Provectus shall not be precluded from seeking consequential or punitive damages on its claims for gross negligence, intentional misrepresentation, and fraudulent concealment at this stage of the litigation.

iii. Provectus shall not be precluded, at this time, from seeking consequential or punitive damages on its claims for breach of contract, negligence, negligent misrepresentation, or professional malpractice to the extent those claims are premised on (1) the outsourcing engagement between the parties or (2) the engagement between the parties under which RSM was to review Provectus's financial statements.

**SO ORDERED**, this the 28th day of September, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge